C. C. Blake, H. M. Blake and M. J. Orr, Trustees for J. Y. Gooch Co., Inc., a Dissolved Corporation v. Commissioner. Perrine Palmer, Jr., and Clotile Palmer v. Commissioner.
Blake v. Commissioner
Docket Nos. 82522, 86145.
United States Tax Court
T.C. Memo 1961-311; 1961 Tax Ct. Memo LEXIS 37; 20 T.C.M. (CCH) 1606; T.C.M. (RIA) 61311; November 14, 1961
*37 Cyrus A. Neuman, Esq., Pan American Bldg., Miami, Fla., for the petitioners in Docket No. 82522. Julius G. Hirsch, Esq., 29 Broadway, New York, N. Y., and John T. Reges, Esq., for the petitioners in Docket No. 86145. Richard W. Roe, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in income tax for the year 1957: J. Y. Gooch Co., Inc.
$31,200.00
Perrine Palmer, Jr. and Clo-
tile Palmer
44,811.05 The issues are: 1. Whether $60,000 paid by J. Y. Gooch Co., Inc. to Perrine Palmer in 1957 represented compensation paid to Palmer for services rendered to the corporation, or whether it represented the purchase price of an option to buy fifty percent of the corporation's stock. 2. Whether $30,000 placed in escrow by J. Y. Gooch Co., Inc. in favor of Perrine Palmer in 1957 was income to Palmer in that year. 3. Whether Perrine Palmer is entitled to certain alleged business expense deductions claimed in his return for the year 1957. Findings of Fact Some of the facts have been stipulated and, as stipulated, are incorporated herein by reference. J. Y. Gooch Co., Inc. (hereinafter *38 referred to as Gooch) was a Florida corporation engaged in the general contracting business in Miami, Florida, from 1930 until March, 1959, when it was dissolved. At all times material herein C. C. Blake (hereinafter referred to as Blake) was president of Gooch and owned substantially all of its outstanding stock. Gooch filed its income tax return for the year 1957 with the district director of internal revenue at Jacksonville, Florida. Petitioners Perrine Palmer, Jr. and Clotile Palmer, husband and wife, are residents of Miami, Florida. They filed a joint income tax return for the year 1957, on the cash basis, with the district director of internal revenue, Jacksonville, Florida. In 1929, when he was nineteen, Perrine Palmer, Jr. (hereinafter referred to as Palmer) was employed by the Bradstreet Company, now Dun & Bradstreet, and remained with that firm until 1933. He was employed by the Orange State Oil Company from 1933 to 1945, except for three years spent in the armed forces. In May, 1945, he was elected Mayor and a City Commissioner of Miami, Florida. Soon after his election as Mayor he went into the rock and sand business with an uncle, and remained in that business until *39 1948. He served as Mayor from 1945 to 1947, and was re-elected as a City Commissioner of Miami in November, 1949. Earlier in 1949 he had gone into the painting contracting business, acquiring a 50 percent interest in Southern Painters, Incorporated. He remained in that business about a year. On December 31, 1949, Gooch, as "First Party" and Palmer as the "Second Party" entered into a contract which provided in part as follows: WHEREAS, the First Party is engaged in the general contracting and building business in the State of Florida, and is desirous of obtaining the services of the Second Party; and WHEREAS, the Second Party is willing to enter into the service of the First Party as Assistant Manager in charge of Public Relations; NOW, THEREFORE, IT IS MUTUALLY AGREED, as follows: (1) That the First Party hereby hires and employs the Second Party, and that the Second Party shall enter into the service of the First Party for the term of one (1) year from the 1st day of January, 1950, as Assistant Manager in charge of Public Relations; and that the Second Party shall perform such other duties pertaining to the First Party's building and contracting business as the First Party *40 may direct. (2) That, during the term of this agreement, the Second Party shall devote his time and energy to the furtherance of the business of the First Party, under its direction, and to his best endeavor and to the utmost of his skill and ability exert himself as Assistant Manager in charge of Public Relations of the First Party, and generally exert himself for the profit, benefit and advantage of said business, and to execute and perform such duties as may be required of him by the First Party. The parties hereto understand that the Second Party holds an official position in the City of Miami, Florida, and the time required of him for the performance and fulfillment of his duties as such shall be deducted from the time which the Second Party shall devote to the affairs and business of the First Party. * * *
(4) That the First Party shall pay unto the Second Party for his services aforesaid, a sum equal to 50 per cent of the net profits of the said business of the First Party (before provision for Federal income tax due by the First Party), for the calendar year commencing January 1, 1950, which shall be determined as hereinafter provided: (A) That the net profits of *41 the said business for the period above mentioned shall be determined by deducting from the earnings of the First Party all expenses of any and every nature and character, together with all salaries and bonuses paid to officers (with the exception, however, of any salary or bonus which may be paid to the President of the First Party, Charles C. Blake, or his successor, or any member of his family). (B) That the term "net profits" as used in the preceding paragraph herein shall be such amounts as shall have been earned and received by the First Party during the term of this agreement for work actually performed and contracts or jobs performed by it during said period. There shall be excluded, however, from such contracts or jobs, the following: Broward Hotel, Fort Lauderdale, Florida, Mercy Hospital, Miami, Florida, Verdier Disposal Plant, Miami, Florida
* * *
(D) If this contract is not renewed between the parties on or before its expiration date, the Party of the First Part shall pay unto the Party of the Second Part 50 per cent of the net profits earned by the Party of the First Part from work in progress on December 31, 1950, except the jobs mentioned in paragraph (4)(B) *42 hereof. The net profits payable under this provision of the agreement shall be due and payable at the conclusion of each job. * * *
At the end of 1950 and at the end of each year up to and including 1955, the contract was orally renewed by Gooch and Palmer for one year. Although Palmer's services to Gooch were described in the employment contract as relating to "public relations", they in fact consisted of his procuring or attempting to procure contracts for Gooch. Although Palmer was employed by Gooch, he was not formally on its payroll and it, on his account, did not withhold for social security, Federal taxes or unemployment compensation. He was not an officer of the corporation and had nothing to do with the hiring or firing of any one or its internal management. He was never voted or paid a bonus by the company. Payments made to him by Gooch under his employment contract were referred to in the minutes of the Board of Directors of the company as "commissions". During 1950, 1951 and 1952, Palmer's office was within the main offices of Gooch. His business telephone was the same as that of Gooch, and Gooch paid all his office overhead, including telephone, secretarial *43 and janitorial services. In 1953, by reason of a shortage of space, Palmer moved to a separate office across the hall from the Gooch offices. Gooch paid all the expenses of that office. In early 1956, when additional space became available in Gooch's offices Palmer moved back into the main offices of Gooch. In December 1956, Blake became dissatisfied with Palmer's services and notified him that he was fired. Palmer stated that he was going to consult his lawyer. Blake thereupon employed Miller Walton as Gooch's lawyer. At that time Palmer had already been paid as compensation for the year 1956 his share of the profits earned by Gooch during that year. Walton advised Blake that Gooch was liable to Palmer for 50 percent of the net profits to be earned by it from any uncompleted jobs which were in progress on December 31, 1956. On December 31, 1956, Gooch had only three uncompleted jobs of any consequence in progress. Two of the jobs were for the Southern Bell Telephone Co., and were known as the "Canal No. 1" job and the "4A" job; the third job, of considerably smaller magnitude, was for the Florida Power & Light Co. All three jobs were completed early in 1957. All three jobs had *44 been undertaken pursuant to written contracts. Blake instructed the corporation's bookkeeper, Frank Willison, to compute the estimated profit on these jobs. Willison estimated the Florida Power & Light Co. job profit to be $10,000, which estimate was based upon a fee of $6,000 stipulated in the contract and an increase of $4,000 based upon intervening adjustments which had been agreed to by the Florida Power & Light Co. The actual fee as finally agreed upon in 1957 was $9,000. The two contracts with the telephone company contained a guaranteed contract price which included fixed percentages for fees and overhead. Willison was able to compute the exact portion of the total contract price which represented fees and overhead. In the case of the 4A job, this came to $176,075; in the case of the Canal No. 1 job $25,373. These figures were rounded off at $175,000 and $25,000, respectively. The total gross profit on the three jobs estimated in the manner above set forth came to $210,000. The actual gross profit on the three jobs as finally determined upon completion of the jobs in early 1957 was $211,565.30. All overhead expenses attributable to the three jobs which had been incurred *45 in 1956 had already been deducted in 1956 in determining the corporation's 1956 net profits for purposes of computing Palmer's compensation in 1956. Upon receiving this estimate of $210,000, Blake offered Palmer 50 percent of such amount, reduced by 50 percent of the estimated overhead which would be incurred in the early months of 1957, and would be properly attributable to the three jobs. Palmer refused to accept any reduction for overhead and threatened litigation. After some discussion, Blake agreed to waive the future overhead and agreed to pay Palmer a full 50 percent of the estimated gross profit of $210,000 or the amount of $105,000. Palmer agreed to accept this amount but informed Blake that he would have to consult his lawyer, Marion Sibley, about a written contract reflecting this settlement. Shortly thereafter Palmer presented Blake with a draft of an agreement which recited that the amount of $105,000 was being paid to Palmer by the corporation to purchase from him an option which he had to acquire stock in Gooch. No such option existed. Palmer explained that he wanted the agreement drawn in this way so that he could report the payment as capital gain. Blake thereupon *46 consulted Walton. He explained to Walton that no option existed. Walton stated that if such an [oral] option existed it would be unenforceable under the Statute of Frauds, and demanded that Blake be completely frank with him. Blake insisted that no option existed. Blake inquired as to whether the $105,000 payment would be deductible by the corporation if Sibley's proposed agreement were executed. Walton advised him that no deduction would be allowable. Thereafter Walton attempted without success to persuade Sibley to eliminate the recitations as to an option in the agreement. However, after negotiations, they ultimately orally agreed to a division of the $105,000 into two parts; one part was to be $60,000 to be shown as being paid for an option; the other part was to be $45,000 to be shown as being paid for compensation, with the proviso, insisted on by Sibley, that $30,000 of the latter amount be placed in escrow and paid to Palmer half in 1958 and half in 1959. Palmer told Blake that if he did not agree to these terms he would institute litigation. Blake felt that the corporation could not afford to face litigation. He felt that litigation would destroy the corporation's open *47 bank credit, and would cause it to lose certain construction jobs on which contract negotiations were pending. In addition, Palmer threatened to allege in the lawsuit that the corporation had taken advantage of his position, while he was a member of the City Commission of Miami, to secure contracts with the Florida Power & Light Co. Blake thought that "a smear of this character would have ruined the corporation." Because of this threat of litigation, Blake felt that he had no choice but to accede to Palmer's terms. On February 6, 1957 Gooch and Palmer entered into two contracts. One, captioned "Agreement of Purchase", states that Palmer was "employed" by Gooch on December 31, 1949, to perform services on behalf of Gooch; that on January 1, 1951, it was agreed that Palmer should have an option to purchase one-half of the capital stock of Gooch at any time during the existence of the contract of employment entered into on December 31, 1949, by the surrender of said contract; that Gooch was desirous of repurchasing said option; and that in consideration for the payment of $60,000 by Gooch to Palmer, Palmer sold, assigned, and surrendered said option agreement to Gooch. This "Agreement *48 of Purchase" was prepared by Palmer's attorney. The second contract, captioned "Agreement of Settlement and Release", recites in the preamble that Palmer was "employed" by Gooch by a written contract dated December 31, 1949; that Gooch agreed to pay him for his services 50 percent of its profits as defined in that contract; that "Palmer is severing his employment under said contract, and the parties desire to fix the compensation due him for the years 1957, 1958 and 1959 for work already contracted for but which will not be completed until 1959"; and that Gooch and Palmer agree that: 1. The employment of Palmer by the Company shall be and is hereby terminated as of the close of business of the Company on January 31, 1957. 2. The Company will pay Palmer the amount of $45,000.00 in three annual installments of $15,000.00 each, none of which shall bear interest, the first annual installment being due and payable as of January 31, 1957 and having been paid at or before the signing of this Agreement, the receipt whereof is hereby acknowledged by Palmer, the second annual installment as salary for the year 1958 being due and payable on January 1, 1958, and the third annual installment *49 for salary for the year 1959 being due and payable on January 1, 1959. 3. To assure the payment of the last two annual installments the Company will deposit in escrow with Pan American Bank of Miami, as Escrow Agent, the amount of $30,000.00 to be held in escrow and disposed of as directed in a letter in the form attached hereto as Exhibit 1. * * *
The original draft of the "Agreement of Settlement and Release" was prepared by Walton and submitted by him to Sibley. Sibley wrote Walton that "The Preamble of your agreement makes our position untenable. We will close if you will substitute these two pages for your first and second page otherwise I am fearful the deal cannot be consummated. * * *" The two pages prepared by Sibley were inserted in the final draft. The principal changes made by him consisted of the insertion in the preamble of the statement that "Palmer is severing his employment under said contract, and the parties desire to fix the compensation due him for the years 1957, 1958 and 1959, for work already contracted for but which will not be completed until 1959" and the reference in paragraph 2 of the agreement to the second annual installment "as salary for the *50 year 1958" and to the third annual installment as "salary for the year 1959". There were false statements in both final agreements, namely, in the "Agreement of Purchase", and the "Agreement of Settlement and Release". The statements in the former to the effect that Palmer had an option to purchase one-half of the capital stock of Gooch and that Palmer sold that option to Gooch for $60,000 were completely untrue; there was no such option. The statements in the latter relating to compensation due to Palmer for 1958 and 1959 for work already contracted for but which would not be completed until 1959 was false; the uncompleted work was expected to be completed and was in fact completed within the first few months of 1957. The references in the same contract to "salary for the year 1958" and "salary for the year 1959" were likewise false; the amounts involved were in fact applicable to services rendered prior to 1957 and payable in 1957. Prior to signing the final agreements, Blake inquired of Walton whether his signing a document containing untrue recitations with respect to a non-existent option would constitute a crime. Walton advised him that the public was not involved and that *51 no crime would be committed. Palmer's primary function was to obtain construction contracts for Gooch. After the contracts were signed his duties ended. He performed no services for Gooch after December 31, 1956, and amounts received by him from Gooch after that date were in payment of services rendered before that date. On January 31, 1957, Gooch paid Palmer the amount of $15,000. On February 6, 1957, Gooch paid Palmer $60,000. On February 6, 1957 Gooch deposited $30,000 in an escrow account in favor of Palmer at the Pan American Bank of Miami. The letter accompanying this deposit was in form and substance as required by the "Agreement of Settlement and Release" and reads, in part, as follows: The undersigned, J. Y. GOOCH CO., INC., hereby irrevocably deposits with you in escrow the amount of $30,000.00 to be paid by you to PERRINE PALMER, JR. in two annual installments of $15,000.00 each, neither of which shall bear interest, the first annual installment to be paid on January 1, 1958, the second annual installment to be paid on January 1, 1959. If Mr. Palmer desires to have all or any part of the amount at any time in escrow invested or re-invested for his account in either *52 government bonds or insured savings accounts, at his risk and expense, without liability of any kind on the part of the undersigned or any of its officers, directors or stockholders, you are irrevocably authorized to follow his instructions to that effect, except no disbursements shall be made to Mr. Palmer at any time other than as directed in the preceding paragraph of this agreement. On January 2, 1958, Palmer withdrew from this account $15,000 plus interest amounting to $678.37, and on January 5, 1959, he withdrew $15,000 plus interest amounting to $421.65. Gooch would have paid the escrowed amount of $30,000 directly to Palmer on February 6, 1957, if Palmer had wanted it. The escrow arrangement "was Palmer's idea" and was intended to spread the $45,000 payment over a three-year period in order to reduce his Federal income taxes. Gooch was the only source of Palmer's earned income in 1957, and the income he received from it was for services rendered on or before December 31, 1956. In 1957 Palmer owned 50 of the 1,400 issued shares of DuPont Plaza, Inc. This corporation was in the process of obtaining financing for the construction of a 256-room hotel, an office building, *53 and the DuPont Plaza Center in 1957, and construction was started on these projects during that year. When Palmer left Gooch, on or about December 31, 1956, DuPont Plaza, Inc. was in dire financial circumstances. During the year 1957 Palmer helped it to obtain first mortgage financing and to negotiate subcontracts. He received no fees or compensation from DuPont Plaza in 1957, nor did he have any arrangement to receive any fees or compensation from that corporation in 1957; however, he was placed on its payroll in January 1958. Palmer maintained no office outside his home in 1957 and was not engaged in a business during that year. In the joint return filed by Palmer and his wife for the year 1957, Palmer reported a long-term capital gain of $60,000 from the sale of a stock option and one-half or $30,000 thereof as taxable. He also reported in Schedule C of that return the receipt of $15,000 from his alleged "public relations" business, and claimed as a deduction for expenses incurred in operating that business the amount of $9,233.30. He did not report as income the $30,000 placed by Gooch in the escrow account. Respondent determined that the amounts of $60,000, $15,000 and $30,000, *54 totalling $105,000, were taxable to Palmer as ordinary income. He also disallowed the deduction of $9,233.30 claimed for business expenses. In the return of Gooch for the year 1957, it claimed a deduction of $105,000 for "Commissions" paid to Palmer during that year. Respondent disallowed $60,000 of the claimed deduction on the ground that Gooch had not established that this amount constituted an ordinary and necessary business expense. The amount of $60,000 paid by Gooch to Palmer in the year 1957 was compensation for services rendered. The $30,000 placed in escrow in 1957 by Gooch in favor of Palmer was ordinary income to Palmer in that year. Palmer incurred no ordinary and necessary business expenses during 1957. Opinion RAUM, Judge: 1. We have reached the conclusion, and found as a fact, that the $60,000 paid to Palmer by Gooch in 1957, represented compensation for services rendered by Palmer to Gooch. In reaching this conclusion we have carefully considered conflicting testimony and other evidence relating to this payment. It convinces us that the $60,000 paid to Palmer in 1957 was part of the amount of $105,000 due him under his employment contract when his services *55 were terminated, as his 50 percent of the profits on the uncompleted jobs. It also convinces us that Palmer never had an option to acquire any of the capital stock of Gooch, and that the recitation of the existence of such an option contained in the agreement of February 6, 1957, between Gooch and Palmer was a pure fiction intended to permit ordinary income to masquerade as long-term capital gain. In the circumstances we hold that Gooch is entitled to deduct as an ordinary and necessary business expense the $60,000 it paid to Palmer in 1957, and that this amount was taxable to Palmer as ordinary income received by him in that year for services rendered to Gooch, and not as capital gain. 2. Palmer's contention that the $30,000 deposited in escrow by Gooch on his behalf on February 6, 1957, is not taxable in 1957 also rests upon a foundation of falsehood. The references in the "Agreement of Settlement and Release" to compensation for 1958 and 1959 and to "work already contracted for but which will not be completed until 1959" were false. Palmer was entitled to no salary for 1958 and 1959. The work in progress was expected to be and was in fact completed early in 1957, and Palmer was *56 entitled to compensation in relation thereto in 1957. Gooch was willing to pay it to him in 1957, but it was Palmer who insisted that Gooch pay it into escrow on his behalf. Gooch did so pay this amount on February 6, 1957, into escrow. Gooch no longer had any interest in the fund. It was Palmer's and Palmer's alone, and it was his choice that required the money to be held for him until 1958 and 1959. The whole escrow transaction was merely a transparent attempt to project this 1957 income into 1958 and 1959 and was a mere sham. And, in any event, even apart from the sham that characterizes the transaction, the amounts irrevocably placed in escrow on Palmer's behalf constituted income to him in 1957 in accordance with established principles. , affirmed per curiam, (C.A. 6). We hold that this issue must be decided against him. 3. There remains for determination finally whether the Commissioner erred in disallowing deductions to Palmer for alleged business expenses for 1957 in the amount of $9,233.30. These expenses were broken down in Palmer's 1957 return as follows: Travel
$ 333.82
Promotion
6,350.62
Office Expenses
618.08
Auto Expense
1,113.66
Depreciation on auto
817.12
Total
$9,233.30
*57 Although the record contains substantiation for the alleged expenditures, we are not convinced by the evidence that the items were anything other than personal to Palmer. For example, the evidence strongly suggests that the great bulk of identifiable "office expenses" were simply payments of Palmer's personal telephone bills with respect to telephone service at his home. We are wholly unconvinced by the record that the automobile expenses were other than personal. The evidence reveals also that the so-called "promotion" expenses in the amount of $6,350.62 consist in part of some $2,500 for maintenance of a boat owned by Palmer, as well as various other items not convincingly shown to us to be other than personal. Moreover, there is an additional consideration that is pertinent. Palmer was not in fact engaged in any business in 1957, "public relations" (whatever that may mean), or otherwise. He had not performed any services for Gooch after the close of 1956, and his return for 1957 reflects no business income whatever, apart from amounts received from Gooch. Indeed he testified that during 1957 he "was actually in no business that could be called a business." The evidence does *58 show that he owned 50 of the 1,400 issued shares of DuPont Plaza, Inc., which was then in the process of obtaining financing and negotiating subcontracts in connection with construction started in 1957; and it further shows that Palmer was active to a certain degree in its affairs. But Palmer was not an officer of that corporation nor was he otherwise employed by it in 1957. And even if some of the disputed expenses could be allocated to Palmer's activities in this connection, they would plainly not be deductible by him as his business expenses. The point is well settled. See , where it was said (p. 274): While certain payments made by a stockholder in the interests of the corporation might possibly be of benefit to him as a stockholder, still that fact does not justify a holding that the expenditure was in connection with the stockholder's trade or business. See , where it is stated: "The well established decisions of this Court do not permit any such blending of the corporation's business with the business of its stockholders." We hold that the Commissioner did not err in disallowing the $9,233.30 *59 deduction. Decision will be entered under Rule 50 in Docket No. 82522. Decision will be entered for the respondent in Docket No. 86145.